IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| RICHARD LAVIGNE-SOUCIE on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>BLUE MAX TRANSPORT, INC. and BLUE MAX TRUCKING, INC<br><br>        Defendants. | Case No.: 3:23-cv-00498<br><br>**PLAINTIFF'S OPPOSITION TO "DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(1)"** |

_____

Plaintiff Richard Lavigne-Soucie respectfully submits this opposition to Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1).

Introduction

This case arises under the WARN Act, 29 U.S.C. § 2101 et seq. In general, the WARN Act requires an employer to give affected employees sixty days' advance notice before a "plant closing" or "mass layoff." 29 U.S.C. § 2102. Here, it is undisputed for present purposes that there was a plant closing or mass layoff at defendant Blue Max Transport ("Transport"), and that Transport failed to give the notice required by the WARN Act; the motion does not contend otherwise.

An affiliated company, Blue Max Trucking ("Trucking"), is also sued under the WARN Act's "single employer" theory. At present, it is taken as true that Trucking constituted part of a single employer with Transport. The motion does not claim otherwise,

1

and – as explained below – the motion's implicit premise is that the two constitute the same employer.

Defendants contend that this Court lacks jurisdiction because, they say, Lavigne-Soucie lacks Article III standing and "statutory standing." Both the constitutional and the statutory arguments are premised on the fact that, not long after the plant closing or mass layoff at Transport, Lavigne-Soucie got a job at Trucking. That is the narrow focus of the motion. Accordingly, that is the only disputed issue and the only issue addressed herein.

FACTS

As discussed in the Argument below, the only "facts" properly before the Court on the second issue – "statutory standing" – are those alleged in the Complaint. The "statutory standing" argument is not actually an argument about jurisdiction, addressable under Rule 12(b)(1). Recognizedly, affidavits can be submitted in support of an actual-jurisdiction argument in support of a Rule 12(b)(1) dismissal, such as the Article III standing argument here. Defendants have submitted affidavits. Plaintiff has submitted his own declaration (submitted herewith), without waiver of the point that as to the "statutory standing" argument, there is no actual Rule 12(b)(1) jurisdictional argument and only the facts in the Complaint are properly before the Court.

That being said, the pertinent facts are as follows, as stated in Plaintiff's declaration ["Declaration in Support of Plaintiff's Opposition to "Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1)" ("Plaintiff's Decl.")].

Plaintiff was employed as a flatbed CDL truck driver for Transport from on or about May 17, 2021 through December 30, 2022, when his position was abruptly eliminated and

2

he was discharged without cause on his part and without WARN Act notice. *Id.* at ¶ 2. As part of his employment with Transport, Plaintiff was assigned equipment (e.g., the truck he drove and certain safety gear) and he also was provided with a company fuel credit card. *Id.* at ¶ 3. Plaintiff was instructed to return these items at the time of his discharge. *Id.* At the time of his discharge from Transport, his hourly rate was $22.00 and he typically worked around 60 hours per week. *Id.* at ¶ 4. The routes he drove while employed by Transport were daily routes that allowed him to return home each evening. *Id.* Before Plaintiff's discharge from Transport, he was eligible for, and accrued, paid time off. *Id.* at ¶ 5. Had Plaintiff remained employed by Transport as of January 1, 2023, he would have been credited with approximately 13 days of accrued, paid time off. *Id.* Before his discharge from Transport, Plaintiff had health insurance through his employment. *Id.* at ¶ 6. Plaintiff's health insurance was cancelled at or about the time of his discharge from Transport. *Id.* Many months prior to Plaintiff's discharge, Transport announced it would pay a 2022 bonus to drivers (including Plaintiff). *Id.* at ¶ 7. Plaintiff and co-employees were told that the bonus would be paid in late 2022. *Id.* However, the bonus was not paid during 2022. *Id.* Ultimately, Plaintiff received a payment just after his discharge which Transport called a "bonus" but which netted Plaintiff, after taxes, approximately $19—less than an hour's pay. *Id.* As indicated on the "bonus" paystub (Doc. 9-2), Transport deducted $1200 of the gross amount of the "bonus" as a purported "Dot" deduction. *Id.* Plaintiff was told Transport deducted the $1200 because a customer rejected a load he delivered, claiming it was wet. *Id.* At or around the time of Plaintiff's discharge, Transport gave him no indication that he would be recalled to work. *Id.* at ¶ 8. In fact, Plaintiff has never been

3

recalled to work by Transport. *Id.* Plaintiff understands that Transport has ceased all hauling operations. *Id.* At or about the time of Plaintiff's discharge from Transport, he was informed by Transport that, if he had interest in working for Trucking, he could apply for a position through Trucking's online application. *Id.* at ¶ 9. Since Plaintiff was without work, he decided to complete the Trucking online application. *Id.* Some days later, Plaintiff was called in for an in-person interview by Trucking and told that he needed to take and pass a drug test. *Id.* Plaintiff passed the drug test, he was offered, as a new hire, a dump truck driver position with Trucking, at $19.25 per hour (almost $3.00 less per hour than he was paid at Transport). *Id.* Plaintiff's first day of work for Trucking was January 13, 2023. *Id.* Plaintiff had been unemployed as a result of his discharge from Transport on December 30, 2022 through that date. *Id.* Unlike Transport, Trucking did not assign a truck to Plaintiff after he was hired, which limited the amount of work he was offered. *Id.* at ¶ 10. During the first weeks of working for Trucking, Plaintiff was offered less than half of the hours per week that he was typically working at Transport. *Id.*; *Id.*, Exhibit A- Paystubs. In or about February 2023, Plaintiff was told he could make more hours if he would agree to be away from home Monday through Friday, staying in hotels along the way. *Id.* Plaintiff tried this arrangement for a while at Trucking, because he needed the income, however, from a personal standpoint, this was not sustainable, nor was it something Plaintiff had to do while working at Transport. *Id.* Unlike the accrued paid time off Plaintiff had a Transport, he was provided no paid time off as a new hire at Trucking. *Id.* at ¶ 11. As a new hire with Trucking, Plaintiff was able to select from the health insurance plans that Trucking offered. *Id.* at ¶ 12. However, Plaintiff was not able to keep the former health

4

insurance he had prior to his discharge from Transport because that health insurance coverage had been terminated. *Id*. In early 2023, Plaintiff got behind on his bills, including his mortgage, and risked losing his house because of his lost wages resulting from his discharge and drop in income. *Id*. at ¶ 13. As demonstrated above, Plaintiff's position at Trucking was not substantially similar to the position he had at Transport. *Id*. at ¶ 14.

ARGUMENT

1. Plaintiff has constitutional standing, because he suffered an "injury in fact."

Defendants contend that this Court lacks jurisdiction under Article III because, they say, Lavigne-Soucie lacks the constitutionally-required standing to sue.[1] The element of standing that Defendants attack is "injury in fact." But Lavigne-Soucie did have an injury-in-fact: he lost his job with Transport (as part of a plant closing or mass layoff, without the notice that the WARN Act requires), and suffered financial loss as a result.

The premise for Defendants' no-injury argument is that they try to convey the impression that Lavigne-Soucie lost no money by virtue of losing his job with Transport. Doc. 9-1, p. 1 ("when Plaintiff's employment with BM Transport ended, he made a seamless transition to BM Trucking"); p. 5 ('Plaintiff almost immediately began a job with BM Trucking after his separation from BM Transport. … He continued to receive wages from BM Transport through January 6, 2023, and even received a bonus to bridge the gap in pay prior to his start date with BM Trucking."); p. 5 n.2 ("Notably this additional week

---

[1] Defendants ask this Court to dismiss the case with prejudice. (Doc. 9, p. 1). But a dismissal for lack of standing is a dismissal for lack of jurisdiction; and a dismissal for lack of jurisdiction is necessarily a dismissal without prejudice. *Ali v. Hogan*, 26 F.4th 587, 600 (4th Cir. 2022). In any event, as shown herein, the case must not be dismissed at all.

5

of pay would have provided Plaintiff with income during the week of January 6, 2023, ending on January 13, 2023—the very day Plaintiff began working for BM Trucking.").

But even Defendants' own affidavits show – and Plaintiff's declaration confirms – that he did suffer financial injury from the plant closing or mass layoff at Transport. He was out of work from the end of his employment with Transport on December 30, to the beginning of his employment with Trucking on January 13.

Transport says that it gave him a "bonus" a few days later, which Transport suggests (but does not actually say) made him whole for those two weeks. It most certainly did not. As set forth in the Facts above, this "bonus" was to have been paid in the fall; it was not some act of generosity to tide the employees over after their employment with Transport ended. And the net amount Plaintiff received from that <u>was merely $19.07</u>. (Doc. 9-2 p. 8). Transport unilaterally took, for itself, $1200 of the gross "bonus" amount under a "deduction", as stated in the Facts above. Even the gross amount (to the extent that matters) was equivalent to just under 62 hours at Plaintiff's regular rate of pay with Transport. (Doc. 9-2 p. 7 (reflecting $22.00 regular rate of pay)). Even that gross amount would not have made up for the loss of regular earnings during the 13 days he was entirely out of work. In actuality, the "bonus" did nothing to allay the effects of the nearly two weeks of joblessness.

Moreover, Plaintiff suffered ongoing economic injury beyond that, from the plant closing or mass layoff at Transport. While his rate of pay had been $22/hr at Transport, Trucking hired him on at only $19.25/hr. (Doc. 9-3 p. 7). He lost his better-paying job at Transport, without the notice that the WARN Act requires. As noted in the Facts section above, this caused serious economic hardship to him.

6

So, Plaintiff did suffer immediate and ongoing economic injury-in-fact from losing his job in the plant closing or mass layoff. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017). Because he had a financial injury-in-fact, and because Defendants do not challenge any other aspect of standing, Defendants' constitutional standing argument fails.[2]

2. <u>Defendants' statutory argument is procedurally inappropriate and meritless.</u>

Defendants also contend that Lavigne-Soucie lacks "statutory standing" to sue under the WARN Act because, they contend, he did not suffer an "employment loss" within the meaning of the Act.

This argument is both procedurally inappropriate and substantively wrong.

A. <u>The "statutory standing" argument is procedurally inappropriate.</u>

Defendants' motion is not a Rule 12(b)(6) motion; instead it is a Rule 12(b)(1) motion, contending that the Court lacks subject-matter jurisdiction. The framing of the motion under Rule 12(b)(1) motion permits the Defendants to attach affidavits and argue about the facts – because, of course, one cannot do that under Rule 12(b)(6).

But, as to the question of statutory standing, this is not a proper Rule 12(b)(1) motion because statutory standing is not a matter of subject-matter jurisdiction. *Mayor & City*

---

[2] It is conceivable that Defendants mean to be claiming that Lavigne-Soucie lacks Article III standing because (they claim) he didn't suffer an "employment loss" within the meaning of the WARN Act. Such a contention would be misplaced, because it would gloss over the distinction between Article III jurisdiction (standing) and the merits. Nonetheless, to any extent that an "employment loss" might conceivably be necessary for Article III standing in a WARN Act case, it is shown in the next section that Plaintiff did suffer an "employment loss."

7

*Council of Balt. v. Actelion Pharm. Ltd.*, 995 F.3d 123, 134 (4th Cir. 2021) ("the statutory standing 'label' can be 'misleading' because it 'does not implicate [a court's] subject-matter jurisdiction' (cleaned up)"), quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014); *Del Webb Communities, Inc. v. Carlson*, 817 F.3d 867, 872 (4th Cir. 2016) ("The Carlsons' contention, however, does not implicate the district court's subject-matter jurisdiction. Rather, it is a question of statutory standing").

> [S]tatutory standing [is] a concept distinct from Article III and prudential standing. And typically, "[a] dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim." *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73 (3d Cir. 2011). *See also Vaughn v. Bay Envtl. Mgmt., Inc.*, 567 F.3d 1021, 1024 (9th Cir. 2009) ("[A] dismissal for lack of statutory standing is properly viewed as a dismissal for failure to state a claim rather than a dismissal for lack of subject matter jurisdiction.").

*CGM, LLC v. BellSouth Telcoms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011). "[S]tatutory standing … is perhaps best understood as not even standing at all." *Id.*

Therefore, a statutory-standing motion to dismiss is not viable under Rule 12(b)(1) as it is not actually a matter of jurisdiction. A statutory standing argument can be made under Rule 12(b)(6), *GCM*, 664 F.3d at 52. But Defendants correctly do not argue that they could obtain dismissal under Rule 12(b)(6), because their argument depends on affidavits setting forth alleged facts outside the Complaint.

Therefore, the Court should deny the motion insofar as it is based on a statutory standing argument.

> B. <u>Plaintiff did suffer an employment loss, at least as the case must be viewed now.</u>

In an abundance of caution, Lavigne-Soucie will also address the merits of the "statutory standing" argument. This is without waiver of the point that the "statutory standing" argument is not cognizable on this Rule 12(b)(1) motion and that affidavits cannot be considered as a basis for a "statutory standing" dismissal.

Lavigne-Soucie suffered an employment loss. At least there is a genuine issue of fact about that, and so the motion to dismiss must be denied.

An "employment loss" under the WARN Act is "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period." 29 U.S.C. § 2101(a)(6). Lavigne-Soucie suffered either a termination or a layoff exceeding six months.

A. Termination.

First, Lavigne-Soucie should be viewed as having been terminated by Transport.

Determining whether an employee has been "terminated" or "laid off" is not a simple matter, because the term "layoff" has various meanings depending on the situation. The term is sometimes used to denote any separation for lack of work, whether temporary or permanent. Indeed the term is used, in common parlance, to refer to *any* separation – temporary or permanent – when the separation is not based on any fault of the employee.

> Layoff, Black's Law Dictionary (11th ed. 2019) (defining "layoff" as the "termination of employment at the employer's instigation, usu[ally] through no fault of the employee"); Lay off, MacMillan Dictionary, https://www.macmillandictionary.com/ us/dictionary/british/lay-off_1 (last visited Aug. 13, 2020) (defining to "lay off" as "to end someone's employment, especially temporarily, because there is not enough work for them"); Lay Off, Collins Dictionary, https://www.collinsdictionary.com/us/

9

dictionary/english/lay-off (last visited Aug. 13, 2020) ("If workers are laid off, they are told by their employers to leave their job, usually because there is no more work for them to do.").

*Hill v. Emple. Bens. Admin. Comm. of Mueller Grp. LLC*, 971 F.3d 1321, 1327 (11th Cir. 2020)

But the reason for the employment separation (i.e., lack of work, and no fault of employee) cannot be the dividing line between layoffs and terminations under the WARN Act – because separations under the WARN Act are *always* for lack of work and not because of employee fault.

Under the WARN Act, as the Seventh Circuit has held, the distinction between termination and layoff "require[s] an initial categorization of the dismissal imposed on the employee. Was the worker permanently terminated or temporarily laid off?" *Leeper v. Hamilton Cty. Coal*, 939 F.3d 866, 870 (7th Cir. 2019). The way of making sense of how the WARN Act distinguishes between termination and layoff, then, should be this: an employment separation is a layoff rather than a termination if there is some good reason at the time of separation to believe that the separation is temporary. *Id.* at 871 ("The relevant distinction between a layoff and an employment termination is whether that termination was expected to be temporary or permanent."). Moreover, unless the employer has in place some commitment to rebuild the business and to recall laid-off employees in the future rather than hiring new employees, then there is no good or objective reason to expect that the separation is temporary. A separation without some indication of actual expected temporariness and a commitment to recall when work is available is, in practical terms, nothing but a termination.

10

If an employer gives a WARN Act notice – even belatedly – it should be easy in most cases to determine whether the separation is slated as temporary or permanent. The WARN Act notice is supposed to state explicitly whether it is temporary or permanent. 20 C.F.R. §639.7(d)(1). In this case, however, the employer blatantly violated the Act: there was no WARN Act notice. So, we must look elsewhere.

Here, the employer's documentation about the separation has some ambiguity but points towards this being a termination and not a layoff. Transport submitted to the Court its "separation form," Doc. 9-2, p. 5. That form has boxes to check for "termination" and "layoff"; "layoff" is checked. However, that is best understood as distinguishing between separations for cause vs. separations that are not the employee's fault at all – the colloquial senses of the terms, as described above, and not the way the distinction is used in the WARN Act. In the colloquial sense, as described above, layoffs are not inherently temporary; they can be a type of termination. The fact that the employer checked "layoff" does not mean that the separation was temporary. It means, or at least can mean, that the separation was no-fault.

The form goes on to describe the reason for the separation: "Local driver position <u>has been eliminated.</u>" (emphasis supplied). And the form indicates nothing about the separation being temporary, nor does it say anything about any prospect of recall nor any system for recall. Instead, it indicates that he was being let go because his job was <u>eliminated</u>, a term that does not include any promise of being kept on any recall list.

11

With this understanding, Plaintiff suffered a termination. His job was <u>eliminated</u>, and he was separated from his job without any future entitlement to return to work under any circumstances.

If this was a termination, then the fact that he later got a job with co-defendant Trucking is irrelevant; it does not change the fact that he suffered an employment loss, a termination. Indeed, even if he had been hired back at Transport after being terminated, he still would have suffered an employment loss. *Leeper*, 939 F.3d at 871 ("if an objective observer would conclude that an employee suffered a permanent cessation of his employment relationship, a § 2101(a)(6)(A) 'employment termination' occurred. The employer's subsequent decision to offer the employee his old job cannot retroactively transform that once-permanent firing into a temporary layoff.").[3]

B.  <u>Layoff exceeding six months.</u>

In the alternative, Plaintiff suffered a layoff exceeding six months. He was separated on December 30, and has never been recalled to work.

Defendants claim that he did not suffer a layoff exceeding six months because he soon got a job with Trucking. Ordinarily, of course, the fact that someone gets another job does not preclude them from obtaining relief under the WARN Act; an employee laid off by Transport remains laid off by Transport, even if he manages to find interim employment elsewhere. The only reason that Defendants are able to contend that the job with Trucking

---

[3] Moreover, for reasons explained in the next subsection, the new job at Trucking was not substantially equivalent to the job from which he was separated at Transport. For that reason too it would not keep him from having suffered an "employment loss" through termination at Transport.

12

matters, here, is that they apparently agree with the Complaint's allegations that Transport and Trucking constitute a "single employer."

But Defendants are wrong in claiming that there was no employment loss. First, and most simply, Plaintiff has remained laid off from Transport for more than six months. He has never been recalled from layoff by Transport. Nor was he even recalled from layoff by Trucking. That in itself is an employment loss.

Second, even if being hired by Trucking could keep him from having suffered an employment loss under any set of circumstances, the actual circumstances here show that the hiring by Trucking did not stop him from suffering an employment loss.

As set forth in the Facts, Plaintiff got a job with Trucking not by being recalled from layoff but by applying for a job. He had to apply, and be interviewed, and do a drug test. He was explicitly treated as a "new hire," Doc 9-3 pp. 9.  He was required to sign a promise that he would pay hundreds of dollars for "training" if he did not last a month. The vacation time he had accrued at Transport was not honored by Trucking, which again was treating him as a new hire.

And the job with Trucking was much worse than the job with Transport had been. The hourly wage at Trucking was lower, and the hours of work available to him at Trucking were substantially smaller and more sporadic than the steady work – including overtime – that he had worked under Transport. In order to gain more hours to try to make a living, he had to switch to over-the-road travel leaving him away from home during the week, whereas his job with Transport had him home every night. The work was so much less financially rewarding, than the work at Transport, that he had trouble meeting his mortgage

13

and other budget items. It was simply unworkable, as compared to the job at Transport from which he had been separated.

*Teamsters Local 819 v. Textile Deliveries*, 2000 U.S. Dist. LEXIS 13441 (S.D.N.Y. 2000), is instructive. Like this case, *Teamsters Local 819* was a WARN Act case in which employees lost their jobs with Textile Deliveries (referred to in the opinion as TDS). Then some were hired by another company (Old Dominion) that was alleged to be a "single employer" with the original employer, TDS. One question was whether those who had been hired by Old Dominion had suffered an employment loss. (In that case, the question mattered in the determination of whether there had been enough employees who suffered an "employment loss" to make up a "plant closing" or "mass layoff" covered by the WARN Act.) The court wrote:

> In the case of the twenty-five TDS employees hired by Old Dominion, twenty-one of them were hired within a week of the closing of TDS's operations. However, timing is not dispositive and the Court should look at the "actual employment situation of workers." Martin, 877 F. Supp. at 113 (noting that the legislative purpose of WARN requires such a practical view). That is, even if employees do not experience a temporal break in employment, employees may experience an employment loss if they are rehired, transferred, or reassigned to positions that amount to constructive discharges.

*Textile Deliveries*, 2000 U.S. Dist. LEXIS 13441, *17. The court further explained, "Where employees are rehired into inferior positions under unfavorable terms and conditions, such rehirings may also lead to employment losses." *Id.*, *17-18.[4]

---

[4] *Textile Deliveries* has been quoted and followed in this regard by *Adames-Milan v. Centennial Communs. Corp.*, 500 F. Supp. 2d 14, 24 (D.P.R. 2007), and *Michel v. DHL Worldwide Express, Inc.*, No. 3:08-CV-1909 (JCH), 2010 U.S. Dist. LEXIS 157962, at *7 (D. Conn. Jan. 20, 2010).

14

The court found a genuine issue of material fact as to whether those employees had suffered an employment loss. There was evidence that the employees had been treated as new hires by Old Dominion, and that the terms and conditions of employment were not substantially equivalent.

> According to Local 819, however, the twenty-five individuals hired by Old Dominion were not placed into substantially equivalent positions; they lost benefits, such as seniority, health, welfare, pension and vacation benefits, and were not placed into substantially equivalent positions. Thus, the TDS employees … were not placed in substantially equivalent positions pursuant to an established reduction-in-force program. They were terminated with the possibility of applying for new positions as to which there is a dispute whether the positions were substantially equivalent to their prior positions. It cannot be said as a matter of law that these employees did not suffer an employment loss.

*Id.*, *18-19.

The same is true here, even more so. Here, the undisputed evidence is that after Transport discharged Plaintiff from his employment, he had to apply as a new hire with Trucking and the position was not substantially equivalent in pay rate, consistency and number of hours of work to be had, or quality of worklife. Accordingly, Lavigne-Soucie suffered an employment loss even if this case is viewed as involving a layoff, despite the fact that he went to work at a worse job for Trucking.

## Conclusion

The motion to dismiss should be denied.

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION**

Pursuant to the Initial Scheduling Order issued by the Honorable Frank D. Whitney in the instant case, the undersigned hereby certifies that this Memorandum complies with the word

15

limitation contained in the Initial Scheduling Order.

Dated: October 10, 2023

                          *s/   Mary E. Olsen*
                          Mary E. Olsen (OLSEM4818)
                          Attorney for Plaintiff
                          THE GARDNER FIRM, P.C.
                          M. Vance McCrary (MCCRM4402)
                          182 St. Francis Street
                          Suite 103
                          Mobile, Alabama 36602
                          Telephone: (251) 433-8100
                          Fax: (251) 433-8181
                          E-mail: molsen@thegardnerfirm.com
                                        vmccrary@thegardnerfirm.com

                          *s/   Jonathan Wall*
                          Jonathan Wall (NCSB No. 22839)
                          John Bloss (NCSB No. 23947)
                          Attorneys for Plaintiff
                          HIGGINS BENJAMIN, PLLC
                          301 N. Elm Street, Suite 800
                          Greensboro, NC 27401
                          Phone: (336) 273-1600
                          Fax: (336) 274-4650
                          Email: jwall@greensborolaw.com
                                        jbloss@greensborolaw.com

                          Stuart J. Miller (SJM 4276)
                          Johnathan Miller
                          Attorneys for Plaintiff
                          LANKENAU & MILLER, LLP
                          100 Church Street, 8th FL
                          New York, NY 10007
                          Telephone: (212) 581-5005
                          Fax: (212) 581-2122
                          E-mail: stuart@lankmill.com
                                        jon@lankmill.com


                          Cooperating Counsel for
                          THE SUGAR LAW CENTER FOR ECONOMIC &
                          SOCIAL JUSTICE, a non-profit law firm

16

Case 3:23-cv-00498-FDW-SCR   Document 12   Filed 10/10/23   Page 16 of 16